UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

UBER, INC.,

                *Plaintiff*,

    -against-

 UBER TECHNOLOGIES, INC. and ADOMNI, INC.
(DBA "UBER OOH"),

          *Defendants*.

----------------------------------------------------------------------x

Index No.: 1:20-cv-02320-PKC

**FIRST AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

       Plaintiff Uber, Inc. ("Plaintiff" or "Uber"), by and through its attorneys Leichtman Law PLLC, Tzimopoulos Law, P.C. and Mavronicolas Law Group PLLC, brings this action against Defendants Uber Technologies, Inc. ("Uber Technologies") and Adomni, Inc. ("Adomni") (collectively, "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

       1.    This is an action for trademark infringement, reverse confusion, unfair competition and false designation of origin, deceptive trade practices, and unjust enrichment under federal, state, and common law.  Plaintiff Uber brings this action in response to the unauthorized use of its trademark, "UBER," by Defendants in connection with the advertising, promotion, and sale of Defendants' services in commerce.

       2.    Plaintiff Uber is an award-winning creative and consulting services agency that provides advertising, business, and technology services, including but not limited to those services with regards to graphic and electronic design, print design, packaging design, event design, social media advertising and strategy, creative consultation services, brand concept and brand

development services, design of information graphics and data visualization materials, graphic illustration, and production (collectively referred to herein as "Plaintiff's Business Services" or "Business Services") based out of New York, New York, United States.  Plaintiff Uber's advertisements have been featured in international and national publications, and its services are regularly purchased or hired by private, public, and non-profit entities throughout the United States and abroad.

3.     Plaintiff Uber originally incorporated on January 7, 1999.  Over time, through diligent personal effort and significant financial investment by its principal and sole owner, Herta Kriegner  ("Ms. Kriegner"), Plaintiff Uber grew from nothing into a premiere one-stop shop for its Business Services, utilized and sought after by well-known domestic and international brands.

4.     Since its incorporation, Plaintiff Uber has used the word mark "UBER" (the "Mark", or "UBER") throughout the State of New York and throughout the United States in connection with the advertising, sale, and promotion of Plaintiff's Business Services to the general public.

5.     The primary means by which Plaintiff Uber promotes the Mark is through its websites, www.uber-inc.com and www.uber.nyc.  In addition to online points of contact, Plaintiff's Business Services—readily identifiable to consumers via the Mark—have been promoted and advertised to clients and third-party consumers, through distribution of its work, by word of mouth, in print publications, through sponsorships, at large-scale vendor events, and through recognition from multiple award academies.

6.     Since its inception, Plaintiff Uber has continuously and prominently used UBER as a trade name and service mark in connection with the promotion, sale and offers to sale, and advertisement of Plaintiff's Business Services to consumers and the general public.

7.     On June 8, 2019, after having continuously used the Mark in connection with the sale, promotion and advertisement of Plaintiff's Business Services for over two decades, Ms. Kriegner, the President and sole owner of Plaintiff Uber, filed an application on Plaintiff Uber's behalf for federal trademark registration of the Mark with the United States Patent and Trade Office (the "USPTO"), in connection with the advertising and sale of its Business Services in both Classes 35 and 42 (the "Application"), serial number 88465110.   The Application has been assigned to Plaintiff Uber, and is pending.   The description of services covered in the application has now been approved by the USPTO, but the grant of the application has been suspended due to a USPTO technical rule, as a result of Defendant Uber Technologies' own competing trademark application as described further below because, even though Uber Technologies is the Mark's junior user, it filed its application first.

8.     Defendant Uber Technologies is a multi-billion dollar technology company offering a continuously expanding variety of business and technology services to consumers, including but not limited to ride-sharing, food delivery, employment recruiting, and logistics (such as freight shipping).   Defendant incorporated on July 16, 2010, approximately eleven (11) years after Plaintiff had been continuously using the Mark in commerce in connection with the advertising, sale, and promotion of its Business Services.

9.     Upon information and belief, a great deal of Defendant Uber Technologies' revenue generation and consumer brand awareness is due to aggressive, large-scale, ubiquitous advertising which promotes the use of its brand and services.   The primary method by which Uber Technologies has and continues to promote, sell, and advertise its services to consumers in commerce nationwide is through use of the word "Uber" as an abbreviation of its full business name.

10.     Defendant Adomni recently began using the brand name "Uber OOH" in conjunction with advertising, design and branding services, at the behest of and pursuant to a business arrangement with Uber Technologies as further discussed below, and is using an unregistered corporate name, "Uber OOH, Inc.," as a "doing business as" name, and is also using "Uber OOH" as a brand name.

11.     It is undisputed that since at least 2012, Uber Technologies' executive and/or managerial personnel have had actual knowledge of Plaintiff Uber's business existence and its brand.  This actual knowledge included the fact that Uber Technologies knew that Plaintiff Uber used the Mark as their sole brand identity to the consuming public and had been using it for years prior to Uber Technologies' existence.

12.     Despite having actual knowledge of Plaintiff Uber's trademark usage for many years, the single word "Uber" has and continues to permeate Defendants' business offerings as their brand identification to consumers, to the Plaintiff's detriment.

13.     Since Uber Technologies came into existence eleven (11) years ago and began using the word "Uber" in its marketing, consumers, employees and contractors of Uber Technologies, and government agencies have repeatedly and overwhelmingly confused Plaintiff's business as being associated with Defendants.  This confusion has included, but is not limited to: Plaintiff's customers and prospective customers; Uber Technologies' own employees arriving at Plaintiff's office mistakenly believing it to be Uber Technologies' own premises; Plaintiff receiving almost daily calls from angry Uber Technologies consumers; visits from disgruntled Uber Technologies consumers; demands from Uber Technologies'_employees, contractors and affiliates requesting compensation or seeking customer support; New York State and other states' Unemployment Insurance and Worker's Compensation claims directed at Uber Technologies

which are charged to Plaintiff's insurance accounts; letters from lawyers seeking damages from Uber Technologies; and other inquiries from federal and state regulators looking for Uber Technologies. In addition to the aforementioned confusion, Plaintiff has and continues to receive harassing and threatening communications from Uber Technologies consumers and contractors, and a number of Defendant Uber Technologies' employees—including senior executives—have and continue to identify themselves on social media and elsewhere as being employees of Plaintiff Uber. In other words, the confusion between Plaintiff and Defendants is rampant and out of control.

14.     Plaintiff has and continues to receive from federal, state, and local agencies and private claimants, workers compensation requests, wage garnishment requests, employee background check requests, child support documentation, unemployment insurance forms, subpoenas, and litigation related documents intended for Uber Technologies.

15.     Because this confusion has, and continues to, cause extreme disruption and burden Plaintiff Uber's business, Plaintiff Uber has attempted on numerous occasions throughout the years to contact Uber Technologies in an effort to resolve this ongoing issue. In response, Defendants have done virtually nothing to ease the confusion and address the deluge of daily items misdirected at Plaintiff intended for Defendants, and instead have more recently expanded their services despite the knowledge of Plaintiff's business to add services that are directly competitive with Plaintiff's business services and/or in their natural zone of expansion.

16.     Defendants' lack of attention to and/or deliberate disregard of the confusion, and its expansion of its mark to invade the Business Services where Plaintiff is the senior user demonstrates a complete lack of good faith in addressing the confusion it has caused.

17.     While Plaintiff was trying to persuade Uber Technologies to address the confusion with no success, it did not file a lawsuit until March of 2020 because Plaintiff was concerned about the expense to do so and, until 2019, understood that Uber Technologies' business did not compete with Plaintiff's business.

18.     However, Plaintiff learned in 2019 that Uber Technologies had created a new business division entitled "Uber Design," supported by public facing websites located at www.brand.uber.com  and www.medium.com/uber-design, and with its principal location in New York.

19.     Upon information and belief, the services offered in connection with Uber Technologies' new division relate to the provision of digital tools, platforms, and guidelines to enable consumers to utilize Uber Technologies in ways that compete directly with Plaintiff's business.

20.     In addition, Uber Technologies has also taken steps in 2019 and 2020 to compete with Plaintiff directly through the offering of third party advertising services, alone, or in concert with Defendant Adomni, utilizing the "UBER" Mark in connection with services such as, but not limited to, Uber Eats and Uber Out of Home (or "Uber OOH") to deliver third party advertising and design services that are directly competitive with Plaintiff, and that target Plaintiff's customers and prospective customers, causing actual confusion and a likelihood of confusion concerning the source of services utilizing the "UBER" Mark in connection with advertising and design related services.

21.     Defendant Uber Technologies has pursued multiple federal trademark registrations with the USPTO for its variety of products, most of which contain the word "Uber" at least as a

partial component.  Some registrations are based on actual use, while others are based on an intent-to-use basis.

22.     Many of Defendant Uber Technologies' federal trademark registrations and applications cover services in Classes 35 and 42, in direct competition with Plaintiff Uber's Business Services and Application, as more fully described below.

23.     On September 12, 2019, Plaintiff received an Office Action response from the USPTO on its Application, indicating amongst other things that its registrability was at risk of being rejected due to a likelihood of confusion due to similarity to Uber Technologies' trademark applications and registrations.

24.     While Plaintiff Uber has, for multiple years and as the lawful senior user of the Mark, attempted to confront junior user Uber Technologies on numerous occasions about ceasing use of the Mark, Uber Technologies has brazenly ignored Plaintiff's pleas for consideration and reconciliation, and has instead chosen to saturate the consumer marketplace with unauthorized use of the Mark for its own commercial benefit, including expansion of the Mark into Plaintiff's Business Services.  The recent Office Action received by Plaintiff, coupled with Defendants' recent entrance into Plaintiff's line of business as direct competitors with various services, including but not limited to "Uber Design," "Uber Eats," and "Uber OOH," and the likelihood that they will attempt federal trademark registration of the same, has added to the actual confusion, created a further likelihood of confusion amongst consumers as to the source of both parties' services, and indicates manifestation into *bona fide* willful trademark infringement of, and tortious interference with, Plaintiff's business, without justification.

25.     As the first user in commerce of the Mark, Plaintiff Uber is the lawful and equitable owner of the Mark, and this action is commenced in order to ensure that its brand, business, and

goodwill will no longer suffer as a result of Defendants' willful, wanton, and intentional infringement, deceptive trade practices, and unfairly competitive use of Plaintiff's Mark.

## PARTIES

26.      Plaintiff Uber is a New York corporation with its principal place of business and headquarters located at 231 West 29th Street, Suite 906, New York, New York 10001.

27.      Defendant Uber Technologies is a Delaware corporation with its principal place of business and headquarters located at 1455 Market Street, 4th Floor, San Francisco, California 94103.  According to the Delaware Department of State, Defendant has designated National Registered Agents, Inc., 160 Greentree Drive, Suite 101, Dover, Delaware 19904, as its registered agent upon whom process against Defendant Uber Technologies may be served.

28.      In addition, Defendant Uber Technologies is registered in New York as a foreign business corporation, with its principal place of business located at 111 Eighth Avenue, New York, New York 10011.    According to the New York Department of State, Defendant Uber Technologies has, for the purposes of this entity registration, designated C T Corporation System, 28 Liberty Street, New York, New York 10005 as its registered agent upon whom process against Defendant Uber Technologies may be served.  Moreover, on information and belief, the principal location from which Defendant Uber Technologies offers its design services under the "Uber Design" brand name is in New York, New York.

29.      Upon information and belief, Defendant Adomni, Inc. is a Delaware corporation with its principal place of business in Nevada, doing business also as  "Uber OOH" or "Uber OOH, Inc."  Defendant Adomni regularly and continuously does business in New York, including but not limited to contracting with owners of thousands of billboards, other media outlets for its customer's advertising needs, and partnering with major New York-based advertising technology companies such as Place IQ and Branded Cities in connection with mobile and geo-location advertising such as the Uber OOH service that is at issue in this lawsuit.

## JURISDICTION AND VENUE

30.    This action arises under the Trademark Act of 1946, 15 U.S.C. § 1051, *et seq.* (the "Lanham Act"), and the laws of the State of New York.

31.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).  This court has supplemental jurisdiction over all other claims asserted herein under 28 U.S.C. § 1367(a).  Alternatively, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

32.    The Court has personal jurisdiction over Defendant Uber Technologies because the injuries Plaintiff complains of herein occurred in the State of New York, because Defendant Uber Technologies is registered as a foreign business corporation and has a principal place of business in the State of New York, and because it transacts a significant amount of systematic and continuous business in the State of New York, including business relating to its infringement of Plaintiff's Mark.

33.    The Court has personal jurisdiction over Defendant Adomni, Inc. because the injuries Plaintiff complains of herein occurred in the State of New York, because Defendant Adomni transacts a significant amount of systematic and continuous business in the State of New York, including business relating to its infringement of Plaintiff's mark.

34.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial number of the events and omissions giving rise to this action occurred in this District.

## BACKGROUND FACTS

35.    Plaintiff Uber is an award-winning seller of its Business Services to business entities and individuals.

36.     Plaintiff has won many awards for its Business Services, including from prestigious design competitions and authorities, such as the Hermes Creative Award in 2009, the Summit Creative Award in 2000, 2001, 2003, and 2006, the Communicator Awards in 2001 and 2015, as well as many more.

37.     Plaintiff Uber primarily promotes and advertises its Business Services to the public through its websites, www.uber-inc.com and www.uber.nyc, as well as by sponsoring high-profile events, purchasing advertisement pages in print publications, and through word-of-mouth references from preexisting clients.  True and correct copies of a portion of the www.uber-inc.com and www.uber.nyc websites' home pages, an example of one of Plaintiff's magazine advertisements, certain awards Plaintiff has won for its Business Services, as well as a flyer for one of Plaintiff's sponsored events, all showcasing Plaintiff's use of the Mark in its business advertising, are hereto attached as **Exhibit 1**.

38.     Plaintiff Uber was incorporated on January 7, 1999.  By at least January 1999, Plaintiff began using UBER as both a trade name and as a service mark in the State of New York.

39.     Ms. Kriegner is of European descent.  "Über" is a European word which denotes an outstanding or supreme example of a particular kind of person or thing.  Ms. Kriegner purposefully adopted the UBER word mark as Plaintiff's business brand identity to indicate to consumers that Plaintiff's services were of extraordinarily superior quality, with a hint of European sophistication and flair.

40.     The Mark is arbitrary in describing the Business Services that Plaintiff sells to consumers and the public.  Because it is arbitrary, it is inherently distinctive, and in any event has acquired secondary meaning to consumers throughout the years as a source identifier for Plaintiff's Business Services.

41.     Since at least January 1999, Plaintiff Uber has and continues to use UBER as a distinctive trade name and trademark continuously, prominently and openly to represent its company and its business, the services it provides, and its unique and special business character. In order to successfully and efficiently promote and advertise Plaintiff's Business Services, Plaintiff adopted the Mark immediately upon its incorporation as both a trade name and as a service mark so as to concisely inform consumers of the source of the services they provide for sale.  Since at least January 7, 1999, Plaintiff Uber has continuously used the Mark in connection with promoting, advertising, and selling its services to consumers.

42.     Plaintiff is the current owner of the domain names for four (4) different websites: www.uber.nyc, www.uber-inc.com, www.ubercustomerservice.com, and www.ubercustomercare.com.  Plaintiff purchased these domain names in order to be able to effectively market, promote, and represent its brand to consumers nationwide.  These web pages are accessible to consumers anywhere, and Plaintiff Uber intentionally invested in these websites so as to increase their brand visibility past consumers in the State of New York and internationally.

43.     Since its inception and through its quality-controlled branding and advertising efforts, Plaintiff Uber has sold its Business Services to high-profile domestic and international clients, by way of example and not limitation, to companies such as  BMW North America, JW Marriot, Clinique, and Macy's, and earned a reputation as an exceptional brand for design services of many types.

44.     Plaintiff's past, existing, and prospective customers include national and international companies in the hospitality, hotel, restaurant (formal and casual dining), consumer goods, retail, automotive, electronics, cosmetics and personal care, jewelry, apparel, consumer services, business and professional services, manufacturing, food, and media industries, as well as

non-profit organizations and artists.  Plaintiff's Business Services are offered throughout the United States, as well as outside of the United States.  Within the U.S., Plaintiff's clients have included companies headquartered in every region of the country, including the Northeast, Far West, Midwest, Mountain West, Southeast, Mid-Atlantic and Southwest areas of the country, and those clients' campaigns have included both local and national advertising campaigns.

45.    Defendant Uber Technologies, a business services and technology company offering a variety of services to consumers, incorporated on July 16, 2010, approximately eleven (11) years after Plaintiff had been continuously using the Mark in commerce for sale of its Business Services.

46.    Defendant Uber Technologies began by simply providing technology services that included the software used to facilitate a ride-sharing service to consumers, but has since diversified its business services portfolio exponentially, and is growing its offerings, now offering services ranging from food delivery (Uber Eats) to logistics such as freight shipping (Uber Freight), employment recruiting (Uber Works), and most recently, design and advertising services in direct competition with Plaintiff (including but not limited to Uber Design, Uber OOH, and Uber Eats).

47.    Since its incorporation, Defendant Uber Technologies has grown astronomically in the consumer marketplace in brand awareness and, consequentially, in revenue, now allegedly valued at billions of dollars.  For example, Uber Technologies recently reported that its quarterly revenue for the quarter ended December 2019 was approximately $4.1 billion.

48.    The primary method by which Uber Technologies has and continues to promote, sell, and advertise its services to consumers in commerce is through use of the word "Uber" as an abbreviation of its full business name.

49.     In fact, the word "Uber" has become the sole moniker by which Uber Technologies identifies itself in the marketplace, attached only to other words to indicate other services it provides (e.g., Uber Air, Uber Eats, Uber Freight, Uber Works, Uber Design, Uber OOH).

50.     The single word "Uber" has and continues to permeate Defendant Uber Technologies' business offerings, ranging from its ubiquitous ride-sharing software application (downloadable for free to consumer's personal telephones) to its various print and digital advertisements, and through its website, www.uber.com, which is strikingly and confusingly similar to that of Plaintiff's.  Upon information and belief, Uber Technologies has never marketed itself to consumers as "Uber Technologies," and has now monetized the word "Uber," standing alone, to the tune of many billions of dollars.  True and correct copies of a portion of Uber Technologies' website homepage, where the "Uber" word is prominently displayed, and advertisements showing the same are attached hereto as **Exhibit 2**.

51.     On May 10, 2012, less than a year after Uber Technologies entered the New York marketplace with its ride-dispatching services, and after receiving numerous calls at her business for a car service, Ms. Kriegner attended the RandLuxury Review conference held at Metropolitan Pavilion in the State of New York.  There, she saw a table set up for Defendant Uber Technologies and first became aware of Uber Technologies' existence.  After approaching the two individuals at the table— who identified themselves as Josh Mohrer, the ex-General Manager of Uber Technologies' New York office, and Ed Casabian, an ex-marketing representative of Uber Technologies— and informing them that Plaintiff had been operating under the same business name for over a decade and that she was receiving calls directed to Uber Technologies, Ms. Kriegner was told by the two Uber Technologies employees cavalierly that she should change Plaintiff's business name "because they [Uber Technologies] are growing."

52.     Over the next several years, the calls looking for Uber Technologies at Plaintiff's business increased, and have become intolerable during the last three (3) years as Defendant Uber Technologies has endured scandal after scandal concerning its treatment of drivers, contractors and employees since 2017, including claims of sexual harassment and its reputation for having a horrific workplace culture.  Angry consumers, Uber Technologies employees and contractors, and other various individuals mistakenly believing Plaintiff to be Uber Technologies were repeatedly harassing Plaintiff, despite being informed by Ms. Kriegner of the lack of relationship or affiliation, or endorsement of, Uber Technologies' business.  Still, other individuals have created online reviews of Defendant Uber Technologies in an effort to express displeasure with or direct business away from Uber Technologies, which likely have caused some prospective customers of Plaintiff not to do business with Plaintiff as a result of Defendant Uber Technologies' bad reputation and saturation of the market.

53.     When Uber Technologies refused to act to make any effort to stop the confusion in the marketplace, Plaintiff spoke with the press, and the case garnered national attention.

54.     For example, on November 25, 2014, the New York Post published an article titled, "Uber makes life miserable for design company with the same name" on its website, www.nypost.com, further putting Uber Technologies as a whole on constructive notice that the confusion was damaging Plaintiff's business and goodwill.  On December 5, 2014, the New York Times published an additional article titled, "über vs. Uber" on its website, www.nytimes.com. MYFOXNY thereafter posted a substantially similar article on the same day.  True and correct copies of these articles as published are hereto attached as **Exhibit 3**.

55.     Starting in approximately December 2015, Plaintiff began explicitly telling all misinformed callers to contact Mr. Casabian directly.  Upon information and belief, after

complaining to Ms. Kriegner that he couldn't handle the volume of calls he was receiving, and after Ms. Kriegner again requested that Uber Technologies implement a solution to mitigate further confusion between the parties, Mr. Mohrer contacted Ms. Kriegner on Uber Technologies' behalf to discuss resolving the conflict.

56.     On December 18, 2015, Mr. Mohrer and Ms. Kriegner met in person, and Mr. Mohrer offered Plaintiff $80,000.00 USD on the condition that Plaintiff change its business name entirely, despite the fact that Plaintiff had senior rights in the Mark, had invested at that point nearly two decades of sweat equity into the brand, and the company represented Ms. Krieger's life-work.

57.     On February 23, 2016, Ms. Kriegner sent Mr. Mohrer an e-mail correspondence rejecting his offer, counter-offering with a demand of $800,000.00 USD and detailing the grievances Plaintiff had suffered as a business as a result of Uber Technologies' infringing junior usage of the Mark.  This correspondence explained all of the costs and efforts that would be required in order for Plaintiff Uber to change its name as Uber Technologies proposed, and that such costs would continue to increase so long as the matter was left unattended to reflect the actual damages Plaintiff had suffered, the funds needed to rectify the harm already caused, and what would be needed for Plaintiff to rebrand itself.  A true and correct copy of this e-mail correspondence is attached hereto as **Exhibit 4**.

58.     On February 24, 2017, after one year had passed and having never received a response from Mr. Mohrer about her counter-offer, Ms. Kriegner again e-mailed Mr. Mohrer detailing additional misdirected claims and tangible goods sent to her office directed towards Uber Technologies, and requesting a response to her counter-offer.  A true and correct copy of this e-mail correspondence is attached hereto as **Exhibit 5**.

16

59.     On February 26, 2017, Mr. Mohrer responded by e-mail to Ms. Kriegner and suggested a telephone conversation.  Ms. Kriegner and Mr. Mohrer spoke on the telephone on February 27, 2016, in which he claimed that the most Uber Technologies could offer was $120,000.00 USD to compensate Plaintiff, and again insisting that the $120,000.00 USD was conditioned on Plaintiff changing its company name and brand.  Ms. Kriegner rejected this updated offer from the Uber Technologies as insufficient, and has not heard from Mr. Mohrer or Uber Technologies since, despite multiple efforts over several years to further engage in conversation. It is important to note that in all of these settlement discussions Ms. Kriegner had a general understanding that Uber Technologies was not going to compete against Plaintiff.  This is no longer the case, and in the last two (2) years Uber Technologies and Adomni have started to compete with Plaintiff as is detailed in this Complaint.

60.     Since these exchanges, Ms. Kriegner has attempted on multiple occasions to contact individuals at Uber Technologies about its improper uses of the Mark and the damage the confusion has caused to Plaintiff, to no avail.  As examples, true and correct copies of one such e-mail exchange between Ms. Kriegner and one Uber Technologies employee describing a particularly misguided and harassing phone call Plaintiff received on November 7, 2017, as well as a message Ms. Kriegner sent to Mr. Mohrer over LinkedIn on February 8, 2019, are attached hereto as **Exhibit 6**, with personally identifying information redacted.

61.     Besides suffering, on a daily basis for over a decade, from angry and harassing phone calls intended for Uber Technologies, Plaintiff has received a persistent barrage of additional unwanted communications and interference with its business operations as a result of the consumer confusion between Uber, Inc. and Uber Technologies.  This confusion has included, but is not limited to, in the last three years, scheduled shipments of tangible goods (approximately

10,000 backpacks) in Uber Technologies' name to Plaintiff's office, Uber Technologies' own employees or contractors arriving at Plaintiff's office mistakenly believing it to be their own, and Plaintiff receiving multiple telephone calls and correspondences almost every single day from angry consumers and Uber Technologies employees or contractors requesting compensation or customer support.  A true and correct copy of a call log reflecting a sample of misdirected calls is attached hereto as **Exhibit 7**, with personally identifying information redacted.

62.     Indeed, some of Uber Technologies' own senior executives have even identified themselves as being employed by Uber, Inc.  Remarkably, both Mr. Mohrer and Mr. Casabian, who were well aware personally of the difference between the two companies, listed their employers as "Uber, Inc.," indicating that the confusion has permeated well beyond the uninformed public.  True and correct copies of screenshots of Mr. Mohrer's and Mr. Casabian's LinkedIn pages as of December 19, 2015 showcasing the misattributed employment are hereto attached as **Exhibit 8**.

63.     The confusion in the marketplace has and continues to extend to federal and state government agencies, law offices, and private and public companies.  Plaintiff has and continues to receive workers compensation requests, wage garnishment requests, small business loan documentation, employee background check requests, child support documentations, unemployment insurance forms, subpoenas, and lawsuit documents intended for Uber Technologies personnel but directed to Plaintiff's attention.  A true and correct copy of examples of a portion of these documents, addressed to Uber, Inc. and clearly confusing Plaintiff as Uber Technologies, is attached hereto as **Exhibit 9**, with personally identifying information redacted.

64.     The confusion in the marketplace has even extended to artificial intelligence.  For example, consumers utilizing iPhone's "Siri" virtual assistance feature are constantly misled to

believe that Uber Technologies is in fact Plaintiff.  True and correct copies of examples of the results that "Siri" generates when consumers request information for Uber Technologies are hereto attached as **Exhibit 10**.

65.     As if things could not get any more difficult for Plaintiff to run its business without interference, on April 29, 2019, Ms. Kriegner ran a credit report with Equifax, a credit reporting agency for businesses, which rated Plaintiff's business as an "F."  This credit report has Plaintiff's correct address, but the business name is incorrectly listed as Uber Technologies, Inc., mistakenly lists an Uber Technologies driver as an employee of Plaintiff, and identifies Plaintiff as having liens and judgments against it (which it does not).  A true and correct copy of a screenshot of this credit report is hereto attached as **Exhibit 11**.  This erroneous credit rating still persists despite Plaintiff's efforts to correct it, and its presence is harming Plaintiff's business and ability to obtain credit and is likely to cause Plaintiff to lose business and to dilute and tarnish Plaintiff's brand.

66.     The confusion and interruption to Plaintiff's business is so burdensome that Ms. Kriegner was forced to develop an entire new page on Plaintiff's website,  www.uber.nyc, titled "Uber vs. Uber" in an attempt to steer confused, mistaken customers back to Uber Technologies and put customers on constructive notice of the lack of relationship.  In addition to the new page, Plaintiff was forced to place a distracting pop-up notice on its homepage explaining the same.  A true and correct copy of a portion of the "Uber vs. Uber" comparison page on Plaintiff's website is hereto attached as **Exhibit 12**.

67.     On June 8, 2019, after having continuously used the Mark in connection with the sale, promotion and advertisement of its services for over two decades, Ms. Kriegner filed the Application for federal trademark registration of the Mark with the USPTO, in connection with the advertising and sale of creative design services in Classes 35 and 42.  The Application is still

pending.  Plaintiff Uber is the lawful owner of the trademark rights in the Application and the
Mark.

68.     After the initial filing of the original Complaint in this action, the USPTO approved
Plaintiff Uber's description of services for which it is entitled to exclusively use the Mark on a
federal basis as follows:

*CLASS 35 Brand concept and brand development services for corporate and individual clients; Brand concept and brand development services for corporate clients; Brand evaluation services; Brand imagery consulting services; Brand positioning services; Branding services, namely, consulting, development, management and marketing of brands for businesses and/or individuals; Consultation services, namely, creative and strategic consultation regarding development and production of marketing campaigns for others; Business consulting services, namely, providing assistance in development of business strategies and creative ideation; Concept and brand development services for corporate clients; Development of marketing strategies and concepts; Event planning and management for marketing, branding, promoting or advertising the goods and services of others; Marketing and branding services, namely, providing customized communication programs to obtain consumer insights and develop branding strategies; Preparation and realization of media and advertising plans and concepts; Social media strategy and marketing consultancy focusing on helping clients create and extend their product and brand strategies by building virally engaging marketing solutions; Design and development of promotional and public relations material; Design, development, and consulting services related thereto in the field of advertising and marketing; Designing*

*material for online and social media campaigns, namely, designing advertising materials; Consulting in the field of designing a brand, namely, brand concept and brand development services for corporate clients; Consulting in the field of creating corporate identity and brand identity for others; Consulting services in the field of special event planning for commercial and promotional purposes; Consulting services in the field of organizing public relations campaigns; Consulting services in the field of designing printed materials, namely, advertising and marketing materials; Custom design and development of printed material in the nature of advertising and marketing materials, electronic marketing materials and online advertising materials.*

***CLASS 42*** *Design of information graphics and data visualization materials; Design services for packaging; Designing of packaging and wrapping materials; Designing theme graphics and multimedia shows for conventions, product launches, trade shows, key note addresses and award ceremonies for others; Designing material for online and social media campaigns, namely, graphic design of promotional materials; Graphic design; Graphic design services; Graphic design services for business to business advertising, marketing and promotional material; Graphic arts design; Graphic arts designing; Graphic illustration and drawing services, namely, custom design of logos, infographics and charts for others; Packaging design; Packaging design for others; Computer graphics design services; Computer graphics design services, namely, creating of print production files and electronic files; Computer aided graphic design; Consulting services in the field of the design of display showcases and packaging; Custom design and development of packaging and websites.*

69.     However, despite approving this description of Plaintiff's Business Services, the USPTO suspended Plaintiff's trademark Application because Defendant Uber Technologies has pending applications in Classes 16, 35 and 42 which overlap with Plaintiff's description of services, including but not limited to U.S. Application Serial Nos. 88192913, 88169887, 88298815, 88018308, 88243029, 88083093, 88328871, 88083500, 87256010, 87430754, 87445745 and 87195689.  Although the USPTO acknowledged that Plaintiff Uber is the senior user of the Mark for those Business Services, because of a technical USPTO rule, the USPTO suspended Plaintiff's Application because Defendant Uber Technologies filed its federal trademark applications first, even though it was the junior user and was aware of Plaintiff Uber before it filed its applications without acknowledging its awareness of Plaintiff's business.

70.     Since its inception, Uber Technologies has pursued multiple federal trademark registrations with the USPTO for its variety of products, most of which contain the word "Uber" at least as a partial component.  Some registrations are based on actual use, while others are based on an intent-to-use basis.

71.     Many of Defendant Uber Technologies' federal trademark applications claim services in Classes 35 and 42, in direct competition with Plaintiff Uber's own Application.

72.     By way of example only and not limitation, for example, in 2019 Defendant Uber Technologies filed a federal trademark application no. 88328871 with the following description of services in overlapping Class 35:

*advertising, marketing, and promotional services; advertising, marketing, and promotional services, namely, promoting third party goods and services; advertising, marketing, and promotional services, namely, advertising services, namely, promoting third party goods and services through on-line medium.*

73.     These contemplated services compete with Plaintiff's Business Services and are also within Plaintiff's natural zone of expansion.

74.     Although this trademark application was filed as an "intent to use" application, Defendant Uber Technologies has taken a number of steps to actually use the Mark in connection with the competing Business Services and services in Plaintiff's natural zone of expansion, and has already used the Mark or will imminently use the Mark in connection with such services, including at least one already in use application in Class 16 for "printed materials" that overlaps with, and is in, the zone of natural expansion even if not in an overlapping class.  .

75.     Such actions to implement the actual use and planned use of the Mark in commerce in connection with services competitive with Plaintiff's Business Services (and services within their natural zone of expansion) by both Uber Technologies and Adomni have been widely reported and disseminated on the Internet and throughout the advertising and branding community at conferences, in advertising industry publications, and in the market generally.  Indeed, some of the competing services have been launched in test markets and possibly more broadly, although Plaintiff presently does not know the full extent of Defendants' activities and future plans.  In connection with their other partners (such as New York based advertising technology firm Place IQ and New York advertising firm Branded Cities), Defendants have developed target lists for

their competitive services in industries that overlap with Plaintiff's customers and prospective customers, in, among other industries: automotive, retailing, manufacturing, food brands, restaurants, beauty brands, and hotels.

76.     For example, and without limitation, Uber Technologies recently created a new business division, which Plaintiff learned about in 2019, called "Uber Design."  Upon information and belief, the services offered in connection with this division relate to the provision of digital tools, platforms, and guidelines to enable consumers to utilize Uber Technologies' proprietary design assets in their own unique ventures.  True and correct copies of a sample of Defendant's usage of "Uber Design" in commerce, as well as Defendant's brand webpage promoting "Uber Design" as fundamental to its brand composite, are hereto attached as **Exhibit 13**.

77.     Moreover, by way of another example and not limitation, after the initial filing of the Original Complaint in this action, Plaintiff learned that Defendant Uber Technologies was also offering advertising and design services to restaurants (and perhaps other brands) in connection with its Uber Eats food-delivery application.   According to an article quoting one Uber Technologies executive in charge of Uber Eats' products and services, the Uber Technologies' executive confirmed to the reporter the company's intentions to become an ad company. "There's a bunch of different ways we can work with restaurants over time.  If we have all the restaurants on the [Uber Eats] marketplace and we give them tools to help them grow, then this will be a very efficient marketplace. They're going to be spending those ad dollars somewhere."  A true and correct copy of the article quoting the Uber Technologies executive and showing what the Uber Eats advertising, branding and design platform looks like is attached hereto as **Exhibit 14**.

78.     Yet another example, without limitation, is Uber Technologies' recent entrance into the mobile outdoor advertising and design and branding business, via its partnership with Defendant

Adomni.   After the initial filing of the Original Complaint in this action, Plaintiff learned that Defendant Uber Technologies had either acquired or partnered with Defendant Adomni to offer advertising, design and branding services to third parties who wish to advertise, initially, on Uber Technologies' ride sharing and delivery vehicles, but which will also be expanded to include thousands of billboards, other screens, and retail locations in an interactive manner.

79.     For example, Defendants are promoting their joint service as offering advertisers a unique and ubiquitous advertising technological and design experience, where the advertiser can reach millions of consumers.   The way they are promoting how the service works, includes, for example, when an Uber Technologies vehicle with an advertisement for a new model of BMW on the top of the vehicle passes by a billboard, the billboard will run a video advertisement showing the new BMW model and the location of a nearby BMW dealership.   For a graphical representation of this process, *see* https://m.youtube.com/watch?v=G1Q1PIHO_Rw, last visited on June 8, 2020:





A true and correct copy of a transcription of this February 26, 2020 advertising conference presentation by Adomni and Uber Technologies, as well as selected screenshots of their powerpoint and video is attached hereto as **Exhibit 15.**

80.     At the recent advertising technology conference referenced above, Adomni's CEO explained how this will work: "And if you put a brand like Target on the top of these vehicles, it's unmissable.  It's unskippable. [. . .] And it's not just on the Ubers, so with Adomni's connected platform, where we have 7,000 digital billboards, you can have your messages shown on multiple screens at the same time.  So as these Ubers pull near these other connected screens, you have an opportunity to tell a story with video, in an immersive, unmissable way."  *See* **Exhibit 15**, at  p. 15-16 (describing "Uber OOH" as "Video Everywhere," and its coordination with other screens not on the vehicles as an "Unmissable Ad Unit"):





81.    On information and belief, one of the Defendants purchased the Internet website domain "uberooh.com" in February 2020.

82.    The Uber OOH website labels itself as "The Official Uber Advertising Network," and its tag line is: "Advertise Everywhere.   Your brand. Uberized." *See* https://www.uberooh.com/.   A true and correct copy of selected pages from the uberooh.com website are attached hereto as **Exhibit 16.**

83.    Between February 2020 through May 26, 2020, in the FAQ section of their website, and of particular relevance to this case because the services advertised directly compete with those of Plaintiff's Business Services, Defendants included the following question and answer:   "Can you help me create my ad content? Absolutely.   All share-of-voice campaigns include complimentary content creation or re-formatting."   A true and correct copy of a screenshot of this FAQ section of Defendants' website from May 26, 2020 is attached hereto as **Exhibit 17**:



84.     Defendants have tried to conceal this competing activity in bad faith by removing this particular FAQ question and answer from their website after Plaintiff pointed it out in a letter to the Court, with the Defendants coordinating this removal some time after the May 26, 2020 status conference with the Court.  Compare the FAQ on **Exhibit 16** with **Exhibit 17**.

85.     The "Privacy Policy" on the uberooh.com website states:  "Uber OOH, Inc. (hereinafter referred to as "Uber OOH", "we", "us" or "our") operates a platform for advertisers to buy units of time that display advertising content on Digital Screens in the markets that Uber OOH operates ("Platform")."  *See* **Exhibit 16**.  However, Plaintiff, through undersigned counsel, has been unable to locate any corporate entity registered in any state with the name "Uber OOH, Inc."  On information and belief, based on information provided by counsel for Uber Technologies, "Uber OOH, Inc." is not an actual corporate entity, but is an unincorporated "doing business as" designation of Defendant Adomni.

86.     The relationship between Uber Technologies and Adomni is not transparent from the public record.  One article stated that Uber Technologies had acquired Adomni, which Uber Technologies, through counsel, has denied, and, in another apparent attempt to conceal its infringing activities, upon information and belief requested the author to correct.  It is also unclear if Adomni is a "mere vendor" to Uber Technologies, and thus an independent infringing entity or whether it is using the mark "Uber" on the "uberooh.com" website and for its competing business services as Uber Technologies' express or implied licensee.  At the aforementioned advertising technology conference, a representative of Adomni stated that it was the "exclusive selling partner" of advertising, branding and design services for Uber Technologies "through uberooh.com."  *See* **Exhibit 15**, at p. 13.  However, if Adomni is not a licensee of Uber Technologies but is using the Uber Mark with Uber Technologies' consent but without a license

containing provisions to protect the goodwill of the Mark, then Uber Technologies' lack of policing of the quality and goodwill of its own purported mark risks genericizing and abandonment of Plaintiff's arbitrary Mark in connection with the Business Services.

87.     Uber Technologies' need and/or desire to enter the Plaintiff's Business Services is highly evident from the competitive environment it finds itself in, because although it has billions of dollars in quarterly revenue, it is not yet a profitable company, and it needs to raise its revenue by growing its business and revenue streams.  Indeed, one of its direct competitors, Lyft, is also entering the advertising business.  As the representative from Uber Technologies' put it at the advertising technology conference, others were putting advertising on Uber Technologies vehicles and thus Uber Technologies was losing control of its own branding guidelines.  *See generally* **Exhibit 15**, at p. 17.

88.     The advantages of Defendants using Uber Technologies' platform to launch their "Out Of Home" advertising services using Plaintiff's "UBER" Mark include the ability to use the Mark for advertising and design services at an unprecedented scale.  As the Adomni CEO stated: "when we think about Google search, and Facebook social, and Amazon's commerce, the other major ubiquitous platform that probably is close to this level in terms of the value it creates for its consumers, is Uber."  *See* **Exhibit 15**, at p. 12 (describing the Uber Technologies platform as among the "Ubiquitous Ad Platforms"):



89.     And, as Uber Technologies' own executive confirmed at the conference: "So about a year ago we started looking at this space seriously, because from our standpoint, this was happening whether Uber decided to participate or not. [. . .]  And then the other piece of it, is scale. We feel like we have the ability, if we want to scale this not just nationally, but internationally. And when we think about that opportunity, I know it gets me very excited.  I know it gets our leadership very excited."  *See* **Exhibit 15**, at p. 17-18.

90.    At the conference, the Uber Technologies executive continued to explain its efforts to enter the advertising, branding and design businesses, stating that Uber Technologies was working with the "Ad Council," a national advertising organization.  *See* **Exhibit 15**, at p. 18.  He further confirmed that the Defendants' services will be a ubiquitous advertising and design service: "[. . .] we don't want this to be kind of a siloed experience for advertisers.  We want this to be connected to the world around it.  Uber is in the real world [. . .] when we thought about how we wanted to roll this out to advertisers, we wanted to make it easy, we wanted to make it, you know plugged in with all of our systems very seamlessly."  *See* **Exhibit 15**, at p. 19 (indicating that "this slide captures it beautifully.  Like we don't want this to be kind of a siloed experience for advertisers, we want this to be connected to the world around it[.]"):



91.     When Plaintiff initially learned about "Uber Design" and Uber Technologies' competing trademark applications in the summer of 2019 (and although at the time it was not aware of either Uber OOH or the Uber Eats advertising, branding and design services being offered by Uber Technologies),  on August 20, 2019, Plaintiff, through its counsel, Tzimopoulos Law, P.C., sent a formal cease and desist letter to Defendant Uber Technologies, describing the numerous transgressions Plaintiff has suffered as a result of the consumer confusion between the two parties.  Uber Technologies did not respond or acknowledge receipt of the letter.  A true and correct copy of this letter is hereto attached as **Exhibit 18**.

92.     On September 12, 2019, Plaintiff received an Office Action response from the USPTO on the Application, indicating amongst other things that its registrability was at risk of being rejected due to a likelihood of confusing similarity to Uber Technologies' mark applications and registrations, many of which are filed under the same classes of services and others which are within the natural zone of natural expansion.  And while the USPTO has now approved the description of services in Plaintiff's Application (as set forth more fully above), Plaintiff's Application is stalled and suspended solely because of Uber Technologies' trademark applications. This problem will undoubtedly be compounded if Uber Technologies or Adomni pursue federal trademark registration for "Uber Design" or "Uber OOH," and by Adomni's apparent purchase of and use of the "uberooh.com" website and use of the "dba" "Uber OOH, Inc." to promote competing business services.

93.     Since Uber Technologies came into existence, Plaintiff Uber has continuously suffered extreme, persistent, and harmful interference with its business stemming from consumers and entities confusing it with Uber Technologies, which has increased significantly since 2017, when the companies in fact have no relationship.  This damage is directly attributable to

Defendants' refusal to abandon use of the word "Uber" in connection with services competitive with Plaintiff's Business Services (and services within their natural zone of expansion), and instead expanding Defendants' use of the Mark into competitive services with the Plaintiff despite having actual knowledge that they are infringing upon Plaintiff's senior legal and equitable priority in the Mark.

94.    Plaintiff's principal Ms. Kriegner, in particular in the past three years, has found herself forced to deal with constant business interruptions and distractions, resulting in significant lost time and productivity. She is often called away from company business to deal with the confusion of various people, governmental entities, vendors, customers and prospective customers relating to Defendant Uber Technologies' business activities. This includes not only Uber Technologies' customers, driver sand contractors, but Plaintiff's own customers and prospective customers. For example, one of Plaintiff's customers was actually confused about which entity to send payment to, and made a large payment to Plaintiff that was intended for the Defendant Uber Technologies.

95.    That same customer later confirmed payment of one of Plaintiff's invoices, which did not arrive in Plaintiff's account. After Ms. Kriegner contacted the customer and asked about the missing payment, the customer informed her that it had confused the two entities for a second time and sent the payment intended for Plaintiff to Defendant Uber Technologies instead.

96.    By way of another example, one of Plaintiff's important vendors allowed Defendant Uber Technologies to claim Plaintiff's account, causing many hours of confusion, restricting Plaintiff's access to its own account and gave Uber Technologies unfettered access and exclusive dominion over to Plaintiff's confidential business information, to the exclusion of Plaintiff. Plaintiff had to send countless emails and involve various levels of the vendor's

executives to gain back full access to its own account and to remove Defendant Uber Technologies' access to the account.

97.     The many hours that Ms. Kriegner has had to spend on addressing this confusion has negatively impacted Plaintiff's sales and the time Ms. Kriegner can devote to her business. Furthermore, in the last three years, Plaintiff has had to hire tax advisors and attorneys to respond to employment related insurance regulator communications and hearings.  Ms. Kriegner's phone has been overwhelmed from 2018 to the present with calls for Defendant Uber Technologies that have caused her to triage her own business calls and in many instances stop answering her phone. Plaintiff also stopped going to trade shows because potential customers appeared to believe she was associated with Defendants, and any online marketing endeavors and SEO (Search Engine Optimization) campaigns that it tried to undertake were either thwarted or needed to be abandoned because of Defendants' ubiquity.

98.     It is readily apparent that the confusion in the marketplace, including among Plaintiff's customers and prospective customers, has, and continues to, cause extreme disruption to the operations of Plaintiff Uber's business.

99.     Plaintiff Uber has attempted on numerous occasions throughout the years to contact Defendants in an effort to resolve the disruptions of her business.

100.    Uber Technologies has failed to negotiate in good faith or even discuss implementing solutions to the problems it has created for the Plaintiff which are impacting her business.

101.    Defendants' conduct has resulted in Plaintiff's inability to control the use of its Mark, including its corporate identity, and control over its goodwill and reputation.  As a result, Plaintiff has incurred substantial disruption, harassment, loss of goodwill, and expenses from the

overwhelming and vast confusion that the Defendants have caused as a result of their saturation of Plaintiff's Mark, as well as suffered from tarnishment, blurring, and disparagement.  Defendants' activities threaten to push Plaintiff out of the market, and their actions have usurped Plaintiff's identity.

102.     Upon information and belief, in addition to the injury caused to Plaintiff, the confusion caused by Defendants' usage of the Mark in their branding has harmed hundreds of individuals seeking unemployment insurance, workers compensation benefits, child support assistance, or other types of recourse, as well as litigants who are unable to timely take action because of improper service of process.  The actual confusion of Uber Technologies' own drivers, employees, contractors and customers thinking that Uber Technologies and Plaintiff are related is so overwhelming as to demonstrate that prospective customers of Plaintiff in a position to make buying decisions will believe that Plaintiff is associated with Uber Technologies (and Adomni dba as Uber OOH) and refuse to deal with Plaintiff, either for that reason, or because they believe incorrectly that Plaintiff is trying to trade on Defendants' names even though Plaintiff is the senior user of the Mark.

103.     Defendants' brazen and unlawful disregard for Plaintiff's existence and use of the Mark, and Defendants' subsequent expanded use thereof and efforts to conceal their competitive activities, has created both actual confusion and a likelihood of confusion as to the source of Plaintiff Uber's services as connected to the Mark, and has caused an inordinate amount of tortious interference with Plaintiff's business operations.

104.     Defendants' entrance into competition with Plaintiff with their "Uber Design," "Uber Eats," and Uber OOH," businesses, without limitation, have forced the Plaintiff to retain counsel to take action on its behalf.

105.    Given   the   Defendants'   enormous   size   and   marketplace   presence,   their disproportionate ability to finance advertising campaigns to limitless audiences, their consumer presences in Plaintiff's business territory, and given the Defendants' recent entry into services that compete with Plaintiff's Business Services and Plaintiff's natural zone of expansion, Plaintiff has been irreparably harmed and its business and goodwill has been effectively swallowed whole by Defendants' actions in Plaintiff's primary marketplace, which is nationwide.  Plaintiff therefore seeks an injunction, damages, corrective advertising remedies, and related relief in the hopes of beginning to recover from the damage it has suffered.

**FIRST CLAIM FOR RELIEF**
**Federal Direct Trademark Infringement, 15 U.S.C. § 1125(a)**
**Defendants Uber Technologies and Adomni (dba Uber OOH)**

106.    Plaintiff Uber incorporates by reference and re-alleges the allegations contained in Paragraphs 1 through 105, inclusive, as though fully set forth herein.

107.    The Mark, "UBER", as used by Plaintiff, is a valid and legitimate trademark under federal law.  It is arbitrary because it is a dictionary defined word that otherwise has no descriptive relation to the services that Plaintiff offers and is therefore inherently distinctive as a source identification of services.  It has acquired secondary meaning amongst consumers as an indication of Plaintiff's premiere design services.

108.    Since January 1999, Plaintiff has and continues to prominently and unambiguously use the UBER mark in commerce in connection with the promotion, sale, and advertisement of its services.  Such use can be seen on Plaintiff's websites, print advertisements, digital media platforms, at sponsored events, and beyond.

109.    Because Plaintiff has been using the Mark since 1999 and Defendant Uber Technologies did not come into existence until 2010, and Defendant Adomni only started using the Mark in the last few months, Plaintiff is the lawful senior first user, and has priority in the exclusive trademark ownership and exploitation rights in and to the Mark.

110.    Defendants' use of an infringing UBER trademark in connection with Defendants' sale, offers of sale, distribution, promotion and advertisement of graphic and other design, branding and advertising services through digital and print advertisements, social media, and the Internet, accessible to consumers freely and readily, including to Plaintiff's customers and prospective customers, constitute Defendants' unlawful use of the Mark in commerce.  This use

establishes a pattern by which Defendants have used the Mark in order to attract public attention to its business and as a designation of origin.

111.    Defendants' use in commerce, without Plaintiff's authorization, of a mark (as well as related Internet domain names) confusingly similar to Plaintiff Uber's trademark, in connection with the advertising, promotion, and sale of Defendants' services, is improper and a violation of Plaintiff's rights.

112.    Defendants' creation of and participation in businesses that compete with Plaintiff's Mark or fall into Plaintiff's natural zone of expansion, including but not limited to, "Uber Design," "Uber OOH" and other services (including "Uber Eats" to the extent it offers advertising and design services or other of Plaintiff's Business Services), render at least a portion of Defendants' many business ventures as directly competitive and similar, or identical, to those offered by Plaintiff Uber under the Mark.  At this time, Plaintiff does not know the full extent of the Defendants' plans to participate in the Business Services using the Mark, but their trademark applications and activities undertaken to date and public statements and websites indicate their intentions are broad and unchecked, and nothing in this Complaint is intended to limit the services Plaintiff seeks to enjoin Defendants' use of the Mark in connection with all of the Plaintiff's Business Services or their natural zones of expansion.

113.    Defendants' use of the Mark in connection with its advertising, promotion, and sale of goods and services has caused actual confusion as to the source identity of services amongst its own employees, consumers of both parties, Plaintiff's actual and prospective customers, Plaintiff's and Defendants' vendors, federal, state, and local government agencies and organizations, attorneys representing Defendants' drivers, contractors and employees, and the public at large, and

has and is likely to continue to cause confusion, mistake or otherwise deceive, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

114.    Defendants have used and continue to use the Mark with actual knowledge that it is the exclusive property of Plaintiff, particularly in the area of Plaintiff's Business Services and their natural zone of expansion, and have engaged in the aforementioned activities with the intent to confuse and deceive the public into believing that Defendants and the services they publicize, promote and/or sell are affiliated with Plaintiff's, or that Defendants are the true source of design and advertising services under the Mark, or that Plaintiff is trading off of Defendants' business, when in fact none of those things is true.  Defendants' actions at all times have been without Plaintiff's consent.

115.    Defendants' activities create the false and misleading impression that Defendants are sanctioned, assigned or authorized by Plaintiff to use the Mark to advertise, promote, distribute, offer for sale or sell services under the Mark when Defendants are in fact unauthorized to do so.

116.    Defendants' use of the Mark tends to and does falsely create the impression that the services advertised, promoted, distributed and sold by Defendants are warranted, authorized, sponsored or approved by Plaintiff when in fact they are not, and tends to and does falsely create the impression that Uber, Inc. is not the true owner of the exclusive rights to the Mark and that Plaintiff is in fact the infringer.

117.    Defendants' unauthorized use of the Mark has resulted in Defendants unfairly benefiting from Plaintiff's diligent advertising and promotion of the Mark throughout the past decade and beyond, and unjustly profiting from exploiting and usurping Plaintiff's exclusive right and goodwill, all to the substantial and irreparable injury of Plaintiff, the public, and Plaintiff's Mark.

118.    Defendants' acts constitute willful trademark infringement in violation of the Lanham Act, 15 U.S.C. §1125(a).

119.    Defendants have been unjustly enriched as a direct and proximate result of their harmful conduct, and have irreparably harmed Plaintiff Uber, including by causing Plaintiff Uber to spend significant resources responding to inquiries and comments relating to its lack of affiliation with Defendants and trying to address and correct the vast and significant misimpressions Defendants have created.  Pursuant to 15 U.S.C. § 1117(a), Plaintiff is entitled to, and should be awarded, Defendants' profits and any damages sustained by Plaintiff, the costs of corrective advertising, and the costs of this action.

120.    Defendants' acts have damaged, and will continue to irreparably damage, Plaintiff Uber.  Plaintiff has no adequate remedy at law for all of these wrongs and injuries.  The damage to Plaintiff includes harm to its goodwill and reputation in the marketplace that money damages cannot compensate.  Plaintiff Uber is, therefore, entitled to a preliminary and permanent injunction restraining and enjoining Defendants from engaging in current and future unlawful abuse, and ordering Defendants to engage in corrective advertising.

### SECOND CLAIM FOR RELIEF
**Reverse Confusion, 15 U.S.C. § 1125(a)**
**Defendants Uber Technologies and Adomni (dba Uber OOH)**

121.    Plaintiff Uber incorporates by reference and re-alleges Paragraphs 1 through 120, inclusive, as though fully set forth herein.

122.    The Mark is a valid, protectable trademark.  As herein described, Plaintiff Uber is the lawful and equitable exclusive owner of the rights in said trademark.

123.    Plaintiff Uber, having continuously used the Mark in commerce in connection with the advertisement, sale, and promotion of Plaintiff's services since at least January 1999, is the

senior user of the Mark.  Defendant Uber Technologies, adopting the Mark for use in commerce over a decade later, and Defendant Adomni adopting the Mark in the last several months, are therefore the junior users of the Mark.

124.    Plaintiff has invested over two decades of financial and personal resources building its brand and reputation into what it is known as today.  Said reputation is vested primarily in Plaintiff's continued and uninterrupted use of the Mark as a designation of origin of its services.

125.    Defendants have used, and are continuing to use, an identical UBER mark in a manner confusingly similar to Plaintiff's own usage, without the consent of Plaintiff, and in a manner that is likely to cause confusion among ordinary purchasers as to the source of the goods.

126.    Defendants' actions are likely to lead, and have already actually lead, the public (including but not limited to Plaintiff's customers and prospective customers) to conclude, incorrectly, that Plaintiff's creative design services originate from Defendants, which have already, and will continue to damage, both Plaintiff, the Mark, and the public.

127.    Defendants' use of the Mark as the junior users have injured senior user Plaintiff's business reputation, impaired its goodwill, and caused extreme and substantial personal and financial burden to Plaintiff's operations.  In addition, Defendants' unauthorized use of the Mark has the potential to lead the consuming public to believe that Plaintiff is an unauthorized infringer, which is in fact untrue and misleading.

128.     Defendants' unauthorized use of the Mark in interstate commerce as described above constitutes reverse trademark infringement and has already, and will continue, to cause consumer confusion, mistake, or deception.

129.    As a direct and proximate result of Defendants' reverse trademark infringement, Plaintiff has suffered and will continue to suffer loss of income, profits and goodwill, and

Defendants have and will continue to unfairly acquire income, profits and goodwill from their unauthorized use of the Mark in their branding and business activities.

130.    As a result of this unauthorized activity, and pursuant to 15 U.S.C. § 1117(a), Plaintiff is entitled to, and should be awarded, Defendants' profits and any damages sustained by Plaintiff, the costs of corrective advertising, and the costs of this action.

131.    Defendants' acts have damaged, and will continue to irreparably damage, Plaintiff Uber.  Plaintiff has no adequate remedy at law for all of these wrongs and injuries.  The damage to Plaintiff includes an inability for Plaintiff to effectively advertise and promote its Mark, and harm to its goodwill and reputation in the marketplace that money damages cannot compensate.

132.    Plaintiff Uber is, therefore, entitled to a preliminary and permanent injunction restraining and enjoining Defendants from engaging in current and future unlawful abuse of Plaintiff's Mark, and ordering corrective advertising be taken by Defendants.

### THIRD CLAIM FOR RELIEF
**Federal Unfair Competition and False Designation of Origin, 15 U.S.C. § 1125(a)**
**Defendants Uber Technologies and Adomni (dba Uber OOH)**

133.     Plaintiff Uber incorporates by reference and realleges the allegations contained in Paragraphs 1 through 132, inclusive, as though fully set forth herein.

134.     In connection with Defendants' advertisement, promotion, distribution, sales and offers of sale of their services, Defendants have used in commerce, and continue to use in commerce, the Mark.

135.     In connection with Defendants' advertisement, promotion, distribution, sales and offers of sale of Defendants' services, Defendants have affixed, applied and used false designations of origin and false and misleading descriptions and representations, including the Mark, which tend to falsely describe the origin, sponsorship, association or approval by Plaintiff of Defendants' services.

136.     Defendants have used the Mark with actual or constructive knowledge of the falsity of such designations of origin, descriptions and representations, all to the substantial detriment of Plaintiff.

137.     Defendants' use of the Mark in connection with Defendants' services constitutes false descriptions and representations tending to falsely describe or represent Defendants and Defendants' services as being either authorized, sponsored, affiliated or associated with Plaintiff, or alternatively, that Defendants are the true origin of Plaintiff's design, branding and advertising services, and that Plaintiff is the unauthorized infringer.

138.     Defendants have used the Mark with the intent to cause confusion and mistake, to deceive and mislead the public, to trade upon Plaintiff's reputation, branding, or goodwill, or to

create the impression that Plaintiff is trading upon Defendants' reputation, branding, or goodwill, and to improperly appropriate to itself the valuable trademark rights of Plaintiff.

139.    Defendants' acts constitute the use in commerce of false designations of origin and false or misleading descriptions or representations, tending to falsely or misleadingly describe or represent Defendants' services as those of Plaintiff's, or vice versa, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

140.    As a result of this unauthorized activity, and pursuant to 15 U.S.C. § 1117(a), Plaintiff is entitled to, and should be awarded, Defendants' profits and any damages sustained by Plaintiff, the cost of corrective advertising, and the costs of this action.

141.    Defendants' acts have damaged, and will continue to irreparably damage, Plaintiff Uber.  Plaintiff has no adequate remedy at law for all of these acts, wrongs and injuries.  The damage to Plaintiff includes harm to its goodwill and reputation in the marketplace that money damages cannot compensate.  Plaintiff Uber is, therefore, entitled to a preliminary and permanent injunction restraining and enjoining Defendants from engaging in current and future acts, wrongs and injurious unlawful abuse, and ordering Defendants to pay for and engage in a campaign of corrective advertising.

### FOURTH CLAIM FOR RELIEF
**Injury to Business Reputation, N.Y. GEN. BUS. L. § 360-l**
**Defendants Uber Technologies and Adomni (dba Uber OOH)**

142.    Plaintiff Uber incorporates by reference and realleges the allegations contained in Paragraphs 1 through 141, inclusive, as though fully set forth herein.

143.    Defendants' unauthorized use of the Mark and related Internet domain names in connection with the goods and services they provide has injured and continues to injure the

business reputation of Plaintiff Uber, including but not limited to by dilution and tarnishment, in violation of N.Y. Gen. Bus. L. § 360-l.

144.    Plaintiff has been and continues to be damaged by Defendants' acts, both in reputation and in personal and financial burden.

145.    Defendants' acts have damaged, and will continue to irreparably damage, Plaintiff Uber.

146.    Plaintiff has no adequate remedy at law for all of these wrongs and injuries.  The damage to Plaintiff includes harm to its goodwill and reputation in the marketplace that money damages cannot compensate.

147.    Plaintiff Uber is, therefore, entitled to a preliminary and permanent injunction restraining and enjoining Defendants from engaging in current and future unlawful abuse.

### FIFTH CLAIM FOR RELIEF
### Deceptive Trade Practices, N.Y. GEN. BUS. L. § 349
### Defendants Uber Technologies and Adomni (dba Uber OOH)

148.    Plaintiff Uber incorporates by reference and realleges the allegations contained in Paragraphs 1 through 147, inclusive, as though fully set forth herein.

149.    Defendants' unauthorized uses of the Mark in connection with the advertising, sale, and promotion of their services, as well as their use of related Internet domain names, are deceptive and misleading.

150.    By its usage of the Mark, Defendants' representations, particularly, but not limited to, with the creation of "Uber Design," "Uber OOH," and the advertising and design services offered through "Uber Eats," suggest that Defendants are the only, or otherwise lawfully exclusive, source for services confusingly to Plaintiff's, and are therefore deceptive and misleading.

151.    Plaintiff Uber has been and continues to be damaged by Defendants' acts.

152.     As a direct and proximate result of the use by Defendants of the Mark and related Internet domain names, Plaintiff has and continues to suffer enormous financial harm for which it is entitled to monetary recovery in an amount to be determined at trial, and has and continues to suffer irreparable reputational harm to its business for which it has no adequate remedy at law.

<u>SIXTH CLAIM FOR RELIEF</u>
**Common Law Trademark Infringement**
**Defendants Uber Technologies and Adomni (dba Uber OOH)**

153.     Plaintiff Uber incorporates by reference and realleges the allegations contained in Paragraphs 1 through 152, inclusive, as though fully set forth herein.

154.     Defendants have, as described herein, without authorization from Plaintiff Uber, used in commerce, a confusingly similar or identical mark and related Internet domain names to Plaintiff in connection with the advertisement, offering for sale, sale, and distribution of their goods and services.

155.     Defendants' use of the Mark in connection with the advertising, promotion, and sale of their services has already caused actual confusion and will continue to cause actual confusion, mistake or deception.

156.     Plaintiff has been and continues to be damaged by Defendants' acts.

157.     As a direct and proximate result of the use by Defendants of the Mark and related Internet domain names,, Plaintiff has and continues to suffer enormous financial harm for which it is entitled to monetary recovery in an amount to be determined at trial, and has and continues to suffer irreparable reputational harm to its business for which it has no adequate remedy at law.

**SEVENTH CLAIM FOR RELIEF**
**Common Law Unfair Competition**
**Defendants Uber Technologies and Adomni (dba Uber OOH)**

158.    Plaintiff Uber incorporates by reference and realleges the allegations contained in Paragraphs 1 through 157, inclusive, as though fully set forth herein.

159.    By their use of the Mark as described herein in connection with its goods and services, Defendants have misappropriated, and monetized to Plaintiff's detriment, significant commercial advantages associated with the Mark that rightfully belong to Plaintiff.  In doing so, Defendants have competed unfairly with Plaintiff.  Defendants' acts as described herein constitute unfair competition, in violation of applicable common law.

160.    By their use of the Mark as described herein in connection with their goods and services, and particularly, but not limited to, with the creation of "Uber Design," ," "Uber OOH," and the advertising and design services offered through "Uber Eats,"  Defendants have misappropriated commercial advantages associated with Plaintiff Uber's reputation as being the premiere company affiliated with the Mark offering creative design, branding and advertising services.  In doing so, Defendants have competed unfairly with Plaintiff Uber, and the acts described herein constitute a violation of applicable common law.

161.    Plaintiff has been and continues to be damaged by Defendants' acts.

162.    As a direct and proximate result of the use by Defendants of the Mark and related Internet domain names, Plaintiff has and continues to suffer enormous financial harm for which it is entitled to monetary recovery in an amount to be determined at trial, and has and continues to suffer irreparable reputational harm to its business for which it has no adequate remedy at law.

## EIGHTH CLAIM FOR RELIEF
### Common Law Unjust Enrichment
### Defendants Uber Technologies and Adomni (dba Uber OOH)

163.    Plaintiff Uber incorporates by reference and realleges the allegations contained in Paragraphs 1 through 162, inclusive, as though fully set forth herein.

164.    Defendants have been unjustly enriched through their continuous and knowingly unauthorized use of the Mark, and Plaintiff has been injured as a result of such unauthorized use.

165.    Plaintiff has been and continues to be damaged by Defendants' acts.

166.    As a direct and proximate result of the use by Defendants of the Mark and related Internet domain names, Plaintiff has and continues to suffer enormous financial harm for which it is entitled to monetary recovery in an amount to be determined at trial, and has and continues to suffer irreparable reputational harm to its business for which it has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Uber prays for judgment in its favor and against Defendants as follows:

(a)    For a preliminary and permanent injunction enjoining Defendants, their respective members, officers, principals, shareholders, agents, servants, employees, contractors, attorneys, successors, and assigns; their divisions, such divisions' respective members, officers, principals, shareholders, agents, servants, employees, contractors, attorneys, successors, and assigns; and those in privity with or in active concert or participation with any of them who receive actual notice of the judgment by personal service or otherwise from any current and future acts of federal, state, or common law trademark infringement, unfair competition, or false designations of origin;

(b)    For an award of monetary damages for the six (6) years preceding the date of the Original Complaint in this action (*i.e.*, from March 16, 2014) in an amount to be proven at trial;

(c)     For an order directed Defendants to pay for and implement a campaign of corrective advertising;

(d)     For costs of this lawsuit;

(e)     For reasonable attorneys' fees;

(f)     For interest as allowed by law; and

(g)     For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Uber hereby demands

a trial by jury for all issues so triable in this case.

Dated: June 11, 2020                                   Respectfully submitted,

**LEICHTMAN LAW PLLC**

By:    _/s/ David Leichtman_

David Leichtman (DL-7233)
Tatsuya Adachi (TA-1996)
Tyler Morris (TM-9427) (admission in the
S.D.N.Y. pending)

228 East 45th Street, Suite 605
New York, New York 10017
Tel: (212) 419-5210
dleichtman@leichtmanlaw.com
tadachi@leichtmanlaw.com

**TZIMOPOULOS LAW, P.C.**

By:    _/s/ George Tzimopoulos_

George Tzimopoulos (GT-6766)
5 Penn Plaza, 19th Floor
New York, New York 10001
Tel: (646) 733-4000
George@Tzimopouloslaw.com

**MAVRONICOLAS LAW GROUP
PLLC**

By:    _/s/ Gregori D. Mavronicolas_

Gregori D. Mavronicolas (GM-4616)

228 East 45th Street, Suite 605
New York, New York 10017
Tel: (646) 484-9569
gmavronicolas@mavrolaw.com

_Attorneys for Plaintiff Uber, Inc._